IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

RUFUS HORTON,

    Petitioner,

    v.

WARDEN, MADISON
CORRECTIONAL INSTITUTION,

    Respondent.

CASE NO. 2:17-CV-0036
JUDGE JAMES L. GRAHAM
Magistrate Judge Kimberly A. Jolson

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the Petition, Respondent's Return of Writ, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that the Petition be **DENIED** and that this action be **DISMISSED**.

### I.    BACKGROUND

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of the case as follows:

> On August 30, 2012, appellant was indicted on one count of aggravated murder, in violation of R.C. 2903.01, with a firearm specification pursuant to R.C. 2941.145, and one count of having a weapon while under disability, in violation of R.C. 2923.13. The charges arose from the shooting death of Charles Rogers on August 18, 2012.
>
> Appellant waived his right to a jury trial on the charge of having a weapon while under disability. The case proceeded to trial before a jury on the aggravated murder and associated firearm specification charge, at which the following evidence was presented.
>
> Lindsay Jennings testified that she began dating appellant's brother, Markee Horton, in August 2012. On August 18, 2012, Markee drove to Jennings' home in a red Mustang. He told

Jennings he was angry because he had just been robbed and asked her to drive him to his mother's house.

At Markee's mother's house, Jennings observed appellant give Markee a handgun. Appellant and Markee had a conversation, but Jennings could not understand what they were saying. Markee returned to the red Mustang and placed the gun appellant had given him on the floor of the car. Appellant got into a black car and drove away.

Markee instructed Jennings to drive to a house located on North 22nd Street. Rogers and a woman were seated on the front porch; a black car was parked in front of the house. Appellant exited the black car and ran to the porch carrying a black handgun. Markee exited the red Mustang carrying the gun appellant had given him and walked up to the porch. Jennings heard appellant say "[a]in't nobody going to steal nothing from my brother. You don't take from my family." (Tr. Vol.I, 138.) Jennings testified that appellant pointed the gun at Rogers' head and pulled the trigger; however, the "gun didn't go off." (Tr. Vol.I, 139.) When the gun failed to fire, Rogers ran away; Markee chased him down the street. Jennings heard a gunshot and saw Rogers fall to the ground. Although Jennings did not see Markee pull the trigger, she saw Markee pointing a gun at Rogers. She admitted she did not know where appellant was at the time the shot was fired.

After the shooting, Markee got back in the red Mustang. According to Jennings, Markee was "upset and scared" and told her "Bitch, drive. I just shot this man." (Tr. Vol.I, 148.) Jennings drove Markee to her home; Markee put the gun "somewhere in [Jennings'] backyard." (Tr. Vol.I, 152.)

Several days after the shooting, Markee had Jennings drive him to Krumm Park "so he could get rid of the gun." (Tr. Vol.I, 155.) Markee removed the clip from the gun and threw it and the gun into a pond on the park grounds. According to Jennings, the gun Markee threw into the pond was the same one appellant provided Markee on August 18, 2012.

Markee stayed at Jennings' home for a few weeks after the shooting. Following his departure, Jennings told the police about the shooting and provided a diagram depicting where Markee had disposed of the gun and the clip.

Christina Ross testified that, on August 18, 2012, she dropped off her niece at a house located next door to Rogers' house. Ross

observed Rogers and his girlfriend on the front porch of Rogers' house. As Ross was about to drive away, a red Mustang "cut in front of me and went into the alley, and then a black car pulled directly in front of me, so I couldn't move." (Tr. Vol.II, 360.) One man exited the red Mustang while another man exited the black car; both men carried guns. The men walked up to Rogers' porch and began arguing with him. The man who drove the red Mustang punched Rogers. Rogers then jumped off the porch and began running down the street. The man who punched Rogers jumped off the porch, "aimed a gun at Charlie, like at his leg part, and tried to fire it, but it didn't go off." (Tr. Vol.II, 373.)

At the same time, the man from the black car "aimed it, and he shot the gun at Charlie." (Tr. Vol.II, 374.) Ross observed Rogers fall to the ground. She then drove around the block, parked her vehicle, and ran back to the area to check on her niece and Rogers. When she returned, the men involved in the shooting were gone. Ross later spoke with police officers about the incident. At trial, Ross was unable to identify appellant as one of the individuals involved in the shooting.

Columbus Police Officer Ryan Lee testified that he and his partner were dispatched to the scene of the shooting. Officer Lee observed "a male laying face down on the sidewalk approximately three to four houses south of 199." (Tr. Vol.I, 82.) He approached the victim and "started talking to him to try and assess if he had a pulse, * * * and he was not moving." (Tr. Vol.I, 83.) Officer Lee observed that the victim was breathing and that he had a "small spot of blood in his back." (Tr. Vol.I, 83.) When Officer Lee rolled the victim over, he noticed a gunshot wound to the victim's chest area. After emergency medical personnel transported the man to a nearby hospital, Officer Lee discovered "a spent projectile bullet on the sidewalk directly where I had rolled the victim over." (Tr. Vol.I, 86.)

Columbus Police Sergeant Joan Schlabach, a member of the crime scene search unit, testified that an unfired .25–caliber cartridge and a spent shell casing from a 9 mm weapon were recovered from the crime scene.

The parties entered into a stipulation that, if called to testify, Dr. Kenneth Gerston, an employee of the Franklin County Coroner's Office, would testify that Rogers suffered a single fatal gunshot wound to his back. The parties further stipulated that, if called to testify, Columbus Police Lieutenant Larry Yates would testify that the Columbus Police underwater search and rescue unit searched

the pond at Krumm Park on September 17, 2012, and found a firearm and clip in the pond using the diagram provided by Jennings.

Columbus Police Detective Mark Hardy testified that he compared a Hi–Point 9 mm Luger pistol recovered from the pond at Krumm Park to a spent 9 mm Luger casing found at the scene of the shooting. Detective Hardy averred that this comparison revealed "sufficient number of matching characteristics that were individual, so I could say that this casing was fired by the same weapon as this test casing." (Tr. Vol.II, 344.) Detective Hardy thus opined that the gun recovered from the pond at Krumm Park was the same gun that fired the 9 mm shell casing recovered from the shooting scene.

John C. Briggs, Jr., testified that in June 2013 he was incarcerated at the Franklin County jail on federal charges of drug possession and possession of a firearm and shared a cell with appellant. According to Briggs, appellant averred that he had been charged with murder, and he read Briggs the discovery materials associated with his case. Appellant said his brother, Markee, "got ripped off for some pills" by an individual named Charlie. (Tr. Vol .I, 227.) After learning about the pill theft, Markee went back to his mother's house and "got [appellant], * * * and then from there, they went to Charlie's house." (Tr. Vol.I, 228.) Appellant averred that Markee and his girlfriend were in a red Mustang, while appellant was in a black car. Both appellant and Markee had guns; appellant had a 9 mm, while Markee had a .25 caliber.

Appellant further related that when he and Markee arrived at Charlie's house, they "got in a scuffle" with Charlie. (Tr. Vol.I, 230.) Markee "went to fire at Charlie, but the gun didn't go off. So Charlie took off running, and that's when [appellant] pulled his gun. He shot at Charlie, and he didn't think he hit him, but he seen a red spot in the back of his shirt." (Tr. Vol.I, 230.) When appellant "found out [Charlie] was dead * * * he said, That's what that bitch gets." (Tr. Vol.I, 230.)

Briggs testified that appellant first blamed the shooting on Markee. However, he later "broke down" and "bragg[ed]" that he shot Charlie. (Tr. Vol.I, 231.) Appellant told Briggs that, after the shooting, he and Markee left the scene in separate cars. Appellant later met up with Markee and gave him the gun he used to shoot Charlie. Markee then "took the gun, took it to Krumm Park, [and] threw it in the pond." (Tr. Vol.I, 234.) Appellant told Briggs that when he was first interviewed by police, he told them "Chuffus

[appellant's nephew] did it"; however, he later "put it on his brother, Markee." (Tr. Vol.I, 235.)

Briggs testified that he did not provide the information about his conversation with appellant in an effort to help himself in his federal prosecution. He specifically averred that he was not promised that he would "get out of [his] prison sentence [or] get probation or the case would go away." (Tr. Vol.I, 236.) He acknowledged, however, that he was told by the prosecutor in the instant case that the United States Attorney's Office would be notified that Briggs had been a cooperating witness and that such information would be relayed to the judge presiding over his federal case.

At the conclusion of trial, the jury returned guilty verdicts on the lesser-included offense of murder and the associated firearm specification. The trial court found appellant guilty of having a weapon while under disability. On November 4, 2014, the trial court issued a judgment sentencing appellant to consecutive sentences of 15 years to life on the murder conviction, 3 years on the firearm specification, and 12 months on the conviction for having a weapon while under disability.

In a timely appeal, appellant sets forth the following five assignments of error for this court's review:

[I.] THE VERDICT OF GUILTY IS NOT SUPPORTED BY LEGALLY SUFFICIENT EVIDENCE.

[II.] THE CONVICTION OF APPELLANT FOR MURDER, [WEAPON UNDER DISABILITY], AND GUN SPECIFICATION, IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

[III.] A PROSECUTOR ENGAGES IN MISCONDUCT DURING REBUTTAL WHEN HE MAKES PERSONAL PROMISES TO THE JURY ABOUT THE AVAILABILITY OF EVIDENCE.

[IV.] THE TRIAL COURT IN A MURDER CASE COMMITS ERROR WHEN IT FAILS TO REQUIRE UNANIMOUS VERDICTS ON THE ELEMENTS OF PRIOR CALCULATION AND DESIGN AND AIDING AND ABETTING, UPON REQUEST BY THE DEFENSE.

[V.] A TRIAL COURT IN A [WEAPON UNDER DISABILITY] CASE WITH A GUN SPECIFICATION COMMITS ERROR

WHEN IT FAILS TO MERGE THE TWO CONVICTIONS
WHEN THE UNDERLYING FACTS SUPPORT IT.

*State v. Horton*, No. 14AP-997, 2015 WL 5771839, at *1–4 (Ohio Ct. App. 2015). On September 30, 2015, the appellate court affirmed. *Id*. Petitioner sought review from the Supreme Court of Ohio, raising one proposition of law:

> It is a violation of criminal defendant's Constitutional due process rights not to require unanimous verdicts on whether that defendant was a principal offender or aider and abettor in a case involving co-defendants.

(Doc. 14-1, PageID# 227). The Ohio Supreme Court declined to accept jurisdiction of the appeal. *State v. Horton*, 144 Ohio St.3d 1507 (Ohio 2016).

While his case was pending before the Supreme Court of Ohio, Petitioner moved to reopen his appeal, pursuant to Ohio Appellate Rule 26(B), before the state appellate court. (Doc. 14-1, PageID# 249). Petitioner asserted that his appellate counsel performed in a constitutionally ineffective manner by failing to raise a claim of prosecutorial misconduct for failure to correct allegedly false testimony by a state's witness, and a claim that the trial court committed prejudicial error in refusing to answer a jury question during deliberations. *See* Memorandum Decision (PageID# 290). The appellate court denied the Rule 26(B) application. (*Id.*) Petitioner did not appeal this decision.

On August 6, 2015, Petitioner filed a petition for post-conviction relief in the state court. (PageID# 297). He asserted that his attorney had a conflict of interest and that he was denied the effective assistance of counsel during plea negotiations. On November 21, 2015, the trial court denied the post-conviction petition. (PageID# 326). Petitioner again did not appeal to the Supreme Court of Ohio.

On January 23, 2017, Petitioner filed this case. He asserts that he was denied a fair trial because the trial court refused to admit certain defense exhibits relating to John Briggs (claim

6

one); that the evidence is constitutionally insufficient to sustain his convictions (claim two); and that he was denied a fair trial due to prosecutorial misconduct (claim three).

## II. DISCUSSION

Respondent argues that Petitioner's claims are procedurally defaulted and, in the alternative, without merit. (Doc. 14). The undersigned agrees that the claims are procedurally defaulted.

### A. Procedural Default

*1. Standard*

Congress has provided that state prisoners who are in custody in violation of the Constitution or laws or treaties of the United States may apply to the federal courts for a writ of habeas corpus. 28 U.S.C. § 2254(a). In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state criminal defendant with federal constitutional claims must first present those claims to the state courts for consideration. 28 U.S.C. § 2254(b), (c). If he fails to do so, but still has an avenue open to him by which he may present his claims, then his petition is subject to dismissal for failure to exhaust state remedies. *Id.*; *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (*per curiam*) (citing *Picard v. Connor*, 404 U.S. 270, 275–78 (1971)). However, where a petitioner has failed to exhaust his claims but would find those claims barred if later presented to the state courts, "there is a procedural default for purposes of federal habeas[.]" *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991), *abrogated on different grounds by Martinez v. Ryan*, 566 U.S. 1 (2012). In other words, "contentions of federal law which were not resolved on the merits in the state proceeding due to respondent's failure to raise them there as required by state procedure" also cannot be resolved on their merits in a federal habeas case. *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977).

To determine whether procedural default bars a habeas petitioner's claim, courts in the Sixth Circuit engage in a four-part test. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986); *see also Scuba v. Brigano*, 259 F. App'x 713, 718 (6th Cir. 2007) (following the four-part analysis of *Maupin*). First, the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule. Second, the court must determine whether the state courts actually enforced the state procedural sanction. Third, the court must determine whether the forfeiture is an adequate and independent state ground on which the state can rely to foreclose review of a federal constitutional claim. *Maupin*, 785 F.2d at 138. Finally, if "the court determines that a state procedural rule was not complied with and that the rule [has] an adequate and independent state ground, then the petitioner" may still obtain review of his or her claims on the merits if the petitioner establishes: (1) cause sufficient to excuse the default and (2) that he was actually prejudiced by the alleged constitutional error. *Id*.

If, after considering all four factors of the *Maupin* test, a court concludes that a procedural default occurred, it must not consider the procedurally defaulted claim on the merits unless "review is needed to prevent a fundamental miscarriage of justice, such as when the petitioner submits new evidence showing that a constitutional violation has probably resulted in a conviction of one who is actually innocent." *Hodges v. Colson*, 727 F.3d 517, 530 (6th Cir. 2013) (citing *Murray v. Carrier*, 477 U.S. 478, 495–96 (1986)).

    *2. Application*

Here, Petitioner arguably raised all of his claims on direct appeal before the state appellate court; however, he failed to raise any of these claims in his appeal to the Supreme Court of Ohio. There, he asserted only that it was a violation of a criminal defendant's right to

due process not to require unanimous verdicts on whether he was the principal offender or an aider and abettor in a case involving co-defendants. Memorandum in Support of Jurisdiction (Doc. 14-1, PageID# 227). In Ohio, "one complete round" of the State's established appellate review process means a defendant must timely and fairly present his claim to the trial court, court of appeals, and the Supreme Court of Ohio in direct review. *Caver v. Straub*, 349 F.3d 340, 346 (6th Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). Thus, by failing to ask the Supreme Court of Ohio to review his claims, Petitioner failed to exhaust the claims he now brings in this federal habeas action. Moreover, because Petitioner did not raise his claims on direct appeal, Ohio's doctrine of *res judicata* now bars his ability to raise such claims in the state courts. *See State v. Perry*, 226 N.E.2d 104, 108 (Ohio 1967) (holding that claims must be raised on direct appeal, if possible, or they will be barred by the doctrine of *res judicata*); *see also State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982); *State v. Ishmail*, 423 N.E.2d 1068, 1070 (Ohio 1981).

Ohio courts have consistently refused, in reliance on the doctrine of *res judicata*, to review the merits of procedurally barred claims. *See Cole*, 443 N.E.2d at 170–71; *Ishmail*, 423 N.E.2d at 1070. Further, the Sixth Circuit has held that Ohio's doctrine of *res judicata* is an independent and adequate ground for denying federal habeas relief. *Lundgren v. Mitchell*, 440 F.3d 754, 765 (6th Cir. 2006); *Coleman v. Mitchell*, 268 F.3d 417, 427–29 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 555 (6th Cir. 2000); *Byrd v. Collins*, 209 F.3d 486, 521–22 (6th Cir. 2000); *Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir. 1998). Finally, with respect to the last *Maupin* factor, the independence prong, the Court concludes that Ohio's doctrine of *res judicata* in this context does not rely on or otherwise implicate federal law. Accordingly, the

Court is satisfied from its own review of relevant case law that *res judicata* rule articulated in *Perry* is an adequate and independent ground for denying relief here.

As explained, however, Petitioner may still secure review of these claims on the merits if he demonstrates cause for his failure to follow the state procedural rules, as well as actual prejudice from the constitutional violations that he alleges. "'[C]ause' under the cause and prejudice test must be something external to the petitioner, something that cannot fairly be attributed to him[,] ' . . . some objective factor external to the defense [that] impeded . . . efforts to comply with the State's procedural rule.'" *Coleman v. Thompson*, 501 U.S. 722, 753 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). But Petitioner has not argued, nor does the record reflect, that his procedural default can be excused by any explanation that would be sufficient under *Murray v. Carrier*. Moreover, Petitioner has not alleged that a manifest injustice led to his conviction. *Schlup v. Delo*, 513 U.S. 298, 326–32 (1995). Accordingly, Petitioner's claims are procedurally defaulted.

### III. CONCLUSION

For the foregoing reasons, the Magistrate Judge **RECOMMENDS** that the Petition be **DENIED** and that this action be **DISMISSED**.

### Procedure on Objections

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen days after being served with a copy thereof. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) ("[F]ailure to object to the magistrate judge's recommendations constituted a waiver of [the] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted). The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

IT IS SO ORDERED.

Date: November 16, 2017
/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE